| | |
|---|---|
| 1 | |
| 2 | |

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH LEWIS, | Civil No. 06cv2475 WQH (NLS) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | **FOR ORDER DENYING PLAINTIFF'S** |
| | **MOTION FOR SUMMARY** |
| MICHAEL J. ASTRUE, Commissioner, | **JUDGMENT [Doc. No. 17] AND** |
| Social Security Administration, | **GRANTING DEFENDANT'S CROSS** |
| | **MOTION FOR SUMMARY** |
| Defendant. | **JUDGMENT [Doc. No. 20]** |

Kenneth Lewis (Plaintiff or Lewis) brings this action under the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's (Defendant or Commissioner) final decision denying his claim for disability insurance benefits. The district judge referred the parties' cross motions for summary judgment for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). After considering the moving papers, the administrative record and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for reversal and/or remand be **DENIED** and that Defendant's cross motion for summary judgment be **GRANTED.**

## PROCEDURAL HISTORY

Lewis filed an application for Disability Insurance Benefits and Supplemental Security Income on November 19, 2003, alleging disability due to back and neck impairments and depression. Administrative Record (AR) 18; 32; 81; 115. He alleged the onset of disability as April 8, 2002. AR 115. The Commissioner denied Lewis' application on March 23, 2004, and then again on reconsideration on July 21, 2004. AR 27-31; 33-38. An Administrative Law Judge (ALJ) held a

hearing on July 25, 2005. AR 410-450. At the hearing Mary Mitchell, Esq. represented Lewis, and Lewis testified on his own behalf. AR 412. Dr. Jack Rothberg testified as the medical expert (ME) and Bonnie Sinclair testified as the vocational expert (VE). AR 412. Based on the testimony and documentary evidence, on October 28, 2005 the ALJ issued a decision denying Lewis' application for benefits. AR 18-24. Lewis filed an administrative appeal, but on September 8, 2006, the Appeals Counsel declined to review the ALJ's decision. AR 5-8. Lewis then filed this action under 42 U.S.C § 405(g).

## **RELEVANT FACTS**

**Background.**

Lewis was born on October 15, 1965. AR 81. He has an eleventh grade education. AR 261. His past relevant work experience includes warehouse forklift driver, shoe store manager, heating and air conditioning installer and tire repairman. AR 18; 432. Lewis alleges that he has been unable to work since his disability began when he was injured on the job in April 2002. AR 433.

**The Neck and Back Pain.**

Dr. Stephen Liebham examined Lewis on April 8, 2002 for neck and back pain after he was injured at work. AR 169. Lewis told the doctor that while bending down to open a drawer, he felt a sharp pain in his upper back.[1] AR 169. Dr. Liebham reported that Lewis should limit activities that required stooping and bending. AR 165. He concluded that Lewis could not lift, pull, or push more than 15 pounds. AR 165.

On June 24, 2002, an MRI of Lewis' cervical spine indicated a mild reversal of normal cervical curvature and evidence of spinal change consistent with his history of fusion at C4 and C5.[2] AR 155. The MRI also showed mild spinal narrowing, non-compressive disc bulging, mild uncovertebral arthrosis[3] at C5-7, and moderate narrowing of the cervical disc space with possible impingement of existing C6 nerve roots. AR 155-156.

---

[1] Other reports say that Lewis was injured while attempting to lift a box of tiles. *See* AR 226.

[2] Four or five years before the injury on April 8, 2002, Plaintiff suffered a work-related injury that resulted in cervical spine surgery with a fusion of C-4 and C-5. AR 210-212.

[3] Uncovertebral arthrosis is a degenerative disease of the spine. *See* Online Medical Dictionary, http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=uncovertebral and http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=arthrosis.

**Dr. Maywood and Dr. Abitbol's Reports.**

On July 12, 2002, Dr. Robert Maywood, Lewis' primary treating physician, diagnosed him with cervical strain and right sided radiculopathy.[4]  AR 225. He said Lewis could return to limited duty at work through July 25, 2002. AR 225. The doctor recommended Lewis not engage in repetitive pushing or pulling at or above shoulder level, and limited his weight-lifting to 15 pounds. AR 225. In a visit on July 25, 2002, Lewis told Dr. Maywood he had numbness through his right arm down to thumb. AR 221, 222. Dr. Maywood said Lewis could return to work with the same restrictions through August 22, 2002. AR 222. He then extended the limited duty with the same restrictions to October 3, 2002. AR 217.

Dr. Maywood referred Lewis to Dr. Jean Jacques Abitbol, an orthopedic spine consultant. AR 210- 216. Dr. Abitbol examined Lewis on September 19, 2002 and concluded that the electromyogram (EMG) performed on August 7, 2002 and nerve conduction studies showed that Lewis did not have cervical radiculopathy. AR 214. Dr. Abitbol, however, said that Lewis had symptoms consistent with cervical radiculitis[5] and a sprain. AR 214. In concluding his review, Dr. Abitbol opined that Lewis did not need surgery at the time and recommended he receive a series of cervical epidural steroids. AR 215.

Both Dr. Maywood and Dr. Abitbol saw Lewis on November 7, 2002. AR 206-207. This time, however, the doctors concluded that Lewis should undergo a CT-Myelogram scan of his neck to determine whether he needed surgery. AR 206-207. On December 31, 2002, Dr. Abitbol reported that the CT scan showed evidence of pseudarthrosis[6] at C4-C5, and a large bony outgrowth at C5-C6 with narrowing of disc space. AR 202. Dr. Abitbol recommended that Lewis undergo a cervical diskectomy and fusion at C4-C6 and referred him back to Dr. Maywood for treatment. AR 202. Dr. Maywood examined Lewis periodically and said he could not return to work for various periods of time, including

---

[4]Radiculopathy is a situation in which the nerve root is compressed due to a vertebral disc bulging from its normal position into the vertebral column. *See* Online Medical Dictionary, http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=radiculopathy.

[5]Radiculitis is an Inflammation of a spinal nerve root. *See* Online Medical Dictionary, http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=radiculitis.

[6]Pseudoarthrosis is a "false joint" formed by fractured pieces of bone that are joined together by fibrous tissue. *See* Online Medical Dictionary, http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=pseudoarthrosis.

through May 3, 2003.  AR 204, 201, 187, 186.

In his May 2003 report, Dr. Maywood opined that Lewis was at a permanent and stationary level for his April 18, 2002 thoracic muscle strain injury and that he already received the maximum benefit of medical care.  AR 181.  He concluded that Lewis' continued need for cervical spine surgery was the result of his prior work-related injury and not related to the incident on April 8, 2002.  AR 178.  Dr. Maywood said that "no work restrictions are necessary with regard to the thoracic spine injury."  AR 181.  Dr. Abitbol continued to see Lewis through 2005 and repeatedly found that he was temporarily totally disabled or unable to work for periods of time up to 45 days.  AR 139, 342, 348, 353, 358, 362, 365, 366, 367.

**Dr. Lizarraras' Physical Residual Functional Capacity Assessment.**

On March 16, 2004, Dr. Albert W. Lizarraras, a state examining physician, examined Lewis and completed a Physical Residual Functional Capacity Assessment.  AR 270-278.  Dr. Lizarraras concluded that Lewis had a sedentary residual functioning capacity and could lift 10 pounds occasionally, less than 10 pounds frequently, stand/ walk or sit for 6 hours in an 8 hour work day, and push or pull to an unlimited degree other than the lift and carry limitations.  AR 271; Def.'s Mem. Ps&As p.4, ll.17-21.  He found that Lewis was occasionally limited in performing activities involving climbing, balancing, stooping, kneeling, crouching and crawling.  AR 272.  He also said that Lewis had no manipulative limitations, other than being restricted from working overhead and performing extreme neck extensions.  AR 273.  Finally, Dr. Lizarraras found that Lewis did not have any communicative, visual or environmental limitations.  AR 274-275.

**Depression.**

On January 1, 2004, Lewis was admitted to Grossmont Hospital after trying to commit suicide.  AR 257; 418-420.  At the hearing Lewis testified that after taking 30 Somas, he decided that he did not want to die and called 911.  AR 419.  When the police arrived he told them that he did not need the police but needed an ambulance, and an altercation ensued.  AR 419.  Lewis stayed in the hospital for two days.  AR 420.

**Dr. Otis' Psychiatric Assessments.**

Dr. John L. Otis conducted a psychiatric evaluation of Lewis on January 2, 2004.  AR 260-262.

He diagnosed Lewis with "adjustment disorder with depressed mood with possible underlying delirium secondary to amphetamines with psychotic features," and noted a Global Assessment of Functioning (GAF) of 55. AR 261. Dr. Otis concluded that Lewis was no longer a danger to himself and allowed him to return home. AR 261. He saw Lewis again on March 23, 2004, after Lewis allegedly tried to commit suicide again by riding his motorcycle into a fence. AR 250-252. Dr. Otis diagnosed Lewis with major depression, drug dependence, impulsive traits. AR 251. He noted a GAF of 40. AR 251. Lewis was monitored for detox and placed on a 72 hour hold. AR 251-252. He did not specify any functional limitations.

**Dr. Dean's Psychiatric Assessment.**

On April 1, 2004, Dr. Maryann Dean, Staff Psychiatrist at the San Diego County Psychiatric Hospital, did a psychiatric assessment of Lewis. AR 292-295. She diagnosed Lewis with depressive disorder and noted a GAF of 40. AR 293-294. Dr. Dean also diagnosed him with amphetamine and alcohol dependence but said he had been in remission for the past two weeks. AR 293. She did not specify any functional limitations.

**Dr. MacMorran's Psychiatric Assessment.**

Dr. William MacMarron, a staff psychiatrist at East County Mental Health, did another psychiatric assessment of Lewis on April 12, 2004. AR 284-288. He diagnosed Lewis with major depression and polysubstance abuse and assessed a GAF of 49. AR 287. During the assessment, Lewis said that he had used methamphetamines as recent as the week beforehand. AR 284. He did not specify any functional limitations.

**Dr. Amado's Mental Residual Functional Capacity Assessment.**

On July 16, 2004, Dr. Henry Amado, a state agency psychiatrist, did a Mental Residual Functional Capacity Assessment of Lewis. AR 296-298. Dr. Amado concluded that Lewis was moderately limited in his ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. AR 296. He also concluded that Lewis was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to respond appropriately to changes in the work setting. AR

297. Dr. Amado said that Lewis was not significantly limited in all remaining mental activities tested. AR 296-297. On the Psychiatric Review Technique Form, Dr. Amado indicated that Lewis has Affective Disorders and Substance Abuse Disorders. AR 299-312. He said that Lewis has a depressive disorder that may be substance-induced,[7] and that he demonstrates anti-social conduct. AR 302; 306; 307. Dr. Amado reported Lewis was moderately limited in maintaining concentration, persistence, and pace, and that he had experienced one or two episodes of decompensation of extended duration. AR 309. Dr. Amado, however, indicated that Lewis was only mildly restricted in performing activities of daily living and maintaining social functioning and that his mental impairment would "not preclude the ability to sustain unskilled work." AR 309, 298.

**Dr. Phillips's July 2005 Report.**

Dr. Arthur Phillips did a psychiatric evaluation of Lewis on July 18, 2005. AR 344-346. He found that Lewis had symptoms of irritability and depression and that Lewis reported he was "over it." Dr. Phillips found that Lewis was alert, and demonstrated normal speech, a coherent thought process, cooperative behavior, normal intellect, depressed mood, normal memory, marginal insight and poor judgment. AR 345.

**Dr. Phillip's Mental Residual Functional Capacity Assessment.**

One month after the ALJ issued his decision, Lewis submitted a Mental Residual Functional Capacity Assessment that Dr. Phillips completed on November 14, 2005, four months after his initial evaluation. AR 404-409. In it, Dr. Phillips reported Lewis was "markedly restricted" in almost all areas, including understanding and memory, sustained concentration and persistence, social interaction and adaptation. AR 404-409.

The Appeals Council took the report into consideration when it denied Plaintiff's request for review. It rejected Dr. Phillips' new assessment because it was not accompanied by new clinical findings and was inconsistent with his July 2005 findings. AR 5-6.

**Lay Witness Testimony.**

Lewis' wife, Robin Lewis, filled out an Adult Third Party Function Report on May 25, 2004.

---

[7]Dr. Amado reported that the Lewis' medically determinable impairment was "Depression Not Otherwise Specified (NOS) v. Substance-Induced" AR 302.

AR 105-113. She said, among other things, that Lewis "can't stand up very long [because] his pain starts back up" and that he can walk only "5-10 minutes" before needing to rest. AR 107, 110. She said he follows written or spoken instructions "O.K." and gets along with authority figures "O.K." AR 110.

## THE ALJ HEARING AND DECISION

**Plaintiff's Testimony.**

Lewis testified that he stopped working because he got hurt on the job in April 2002. AR 433. He testified that although he would like to return to work as a forklift driver, in his opinion, he could not. AR 434. As of the date of the hearing, Lewis had not had surgery on his neck. AR 434. He said his pain medication "does . . . but doesn't" help with his pain symptoms and that it gives him headaches sometimes. AR 428. When asked about his physical symptoms, Lewis responded:

> My neck feels like somebody pulling on my head down into my shoulders. I get like a tingling sensation down in my arm, and both of my thumbs are numb. And my–across my shoulders it's really sore. If feels like somebody gave me a charley horse.

AR 428.

Lewis also testified that he tried to commit suicide approximately three weeks before the hearing. AR 431-432. He said that after he called the crisis hotline and heard they could not help him, he took a "whole bunch of" Darvacet. AR 431. He testified that his friend intervened and made him throw up; he did not go the hospital or call his doctor about the incident. AR 431. Lewis first testified he has suicidal thoughts three or four times a week, then modified his answer to having them everyday, and stated that he just wants to "disappear." AR 430.

**Examination of Medical Expert.**

The Medical Expert (ME), Dr. Jack Rothberg, testified that the record showed Lewis suffered from depressive disorder and poly-substance abuse. AR 435. He said that there was no clear period of sobriety in the medical history and that the record indicated Lewis had been using drugs throughout the relevant period. AR 435. Additionally, the ME testified there was a close connection between Lewis' substance abuse and his mood disorder, and that the substance abuse aggravated Lewis' depression. AR 435. When considering both drug abuse and depression, the ME opined that Lewis probably had moderate restrictions. AR 441. When considering the depression without the substance abuse, he

opined that Lewis would probably have mild to moderate restrictions. AR 441. The ME testified that he did not think Lewis should be relegated to only simple tasks; he thought that while Lewis might have some impairment, he should not be precluded from doing more complex tasks. AR 444.

**Examination of Vocational Expert.**

The Vocational Expert (VE), Bonnie Sinclair, testified that Lewis could not perform his prior work. AR 446. She classified Lewis' prior work as semi-skilled to skilled (involves more detailed tasks) as opposed to unskilled work (involves simple, repetitive tasks). AR 442-443. The ALJ then posed a hypothetical to the VE, and their exchange went as follows:

> ALJ: All right. Let me assume, physically Ms. Sinclair, that individual with the vocational profile you just outlined is restricted to . . . no continuous repetitive pushing or pulling with the right upper extremity, and no work at shoulder level or above with right upper extremity, and the lifting restriction of 15 pounds. With that physical restriction would he be able to do any of his past work?
>
> VE: No, Your Honor.
>
> ALJ: What other work could he do, if any?
>
> VE: That person could-let me please clarify. You are not giving any sedentary, light, or medium on this?
>
> ALJ: Right now I will say sit-stand option would be indicated.
>
> VE: Jobs that accommodate that work restriction at the light level are information clerk. DOT 237 367 010. SVP 2, light. Regional approximately 300, and national 29,000. Also, the job of a counter clerk. DOT 249 366 010. SVP 2, light. Regional approximately 900, national 35,000.
>
> * * *
>
> ALJ: Okay. And lifting would be no more than 15 pounds?
>
> VE: No, no.
>
> * * *
>
> ALJ: And if I find that in addition to the physical impairment he has depression, and that depression would restrict him from complex tasks and detailed tasks, and reduce him to simple repetitive tasks, would he be able to do these?
>
> VE: No, Your Honor. These jobs are not technically accommodating to simple repetitive tasks.
>
> ALJ: If I find that he is restricted from complex or detailed tasks - - this is SVP of 2?
>
> VE: Right.

| | | |
|---|---|---|
| ALJ: | So reduce him to semi-skilled capacity rather than simple repetitive tasks. | |
| VE: | These jobs would accommodate it. | |
| ALJ: | So it would be SVP 2 - - is that considered entry-level, simple? | |
| VE: | SVP 2 is considered entry-level. . . . As soon as you go beyond simple repetitive tasks, both jobs that I identified would accommodate the work restriction. | |
| ALJ: | Yes. I want to define what the capacity of the jobs are. Are they more than simple or less than simple? | |

\*\*\*

VE: . . . What determines whether or not it's a simple repetitive task gets into the reasoning level of the job.

\*\*\*

VE: The job of a counter clerk requires reasoning at 2, math at 2, language at 2, which is the lower levels. So therefore, I believe that would comply with your work restrictions. . . . No, the information clerk will not because it's a 4 on reasoning, 2 on math, and 3 in language . . . . However, I can identify the job of routing aide . . . and that reasoning level is at 2 which complies with the work restrictions that she gave me.

AR 446-449.

**The Written Decision.**

On October 28, 2005, the ALJ issued a written decision denying Lewis' claim for benefits. AR 18-24. First, he concluded Lewis was not engaged in any substantial gainful employment since his alleged onset of disability on April 8, 2002. AR 19. The ALJ stated that although Lewis suffers from severe impairments, the impairments–either individually or in combination–do not meet the criteria in the Listing of Impairments. AR 19. While the ALJ found that Lewis could not perform his past relevant work–based on his residual functioning capacity (RFC) and vocational profile–he found that Lewis could perform other jobs that exist in significant numbers in the national economy. AR 19.

The ALJ explained Lewis' RFC:

> The claimant retains the residual functional capacity to perform light work activities with the option to sit or stand as needed. He is able to lift and/or carry up to 15 pounds, 10 pounds frequently, and to sit, stand, and/or walk up to 6 hours in a 8 hour workday. He is precluded from repetitive pushing and pulling with the right upper extremity, and may not perform work at or above the shoulder level with the right upper extremity. He is limited to the performance of simple repetitive as well as detailed but non-complex mental tasks in the competitive workplace.

AR 19.

## DISCUSSION

**Evaluating Social Security Disability Claims.**

Under the SSA, to qualify for disability benefits an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a); *Batson v. Comm'r*, 359 F.3d 1190, 1194 (9th Cir. 2004).

First, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If, not, then the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of the regulations. 20 C.F.R § 404.1520(a)(4)(ii). If the impairment is severe, the ALJ must then determine whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 C.F.R § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing, he or she must be found disabled. *Id.* If the impairment does not meet or equal a Listing, the ALJ must then determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the applicant cannot perform past relevant work, the ALJ-at step five-must consider whether the applicant can perform any other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1157, 1162 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

**Substantial Evidence.**

The SSA permits an applicant to seek judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and the correct application of legal standards. *Id.* Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). When the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Batson*,

359 F.3d at 1193. Where, as here, the Appeals Council denies a request for review, the ALJ's decision becomes the final agency decision that the court reviews. *Id.* at 1193 n.1.

Here, Plaintiff challenges the ALJ's denial of benefits by arguing his decision is not supported by substantial evidence. He specifically argues that (1) because the ALJ did not find Plaintiff's past work to be full time, the ALJ cannot now allow him to work part time; (2) the ALJ posed an incomplete hypothetical; (3) the ALJ made improper findings regarding Plaintiff's mental limitations; (4) the ALJ did not address a discrepancy between the VE's testimony and information in the DOT; and (5) the ALJ improperly rejected lay witness testimony.

### 1. **Full Time Work.**

Plaintiff argues that the ALJ concluded Plaintiff could only work less than full time because he said Plaintiff could "sit, stand and/or walk up to 6 hours per 8 hour workday." AR 23. Plaintiff says that the ALJ did not find that Plaintiff's past work was less than full time, so that he cannot now allow him to work part time. Defendant argues that Plaintiff can do any of the activities–sitting, standing or walking–for six hours each, for a total of up to 18 hours per day, and thus has the ability to fulfill the full time work requirement of eight hours in a workday.

While Plaintiff makes a point that the ALJ's finding could be interpreted to support a finding that Plaintiff could work only less than full time, substantial evidence supports Defendant's argument that the ALJ did not mean to restrict Plaintiff to part time work. No where else in his decision did the ALJ make an express finding that Plaintiff could work only part time, or that Plaintiff could work for no more than a total of six hours a day. Further, the ALJ did not give the VE a part time work restriction when he posed the hypothetical to her. And when the ALJ identified the jobs available to Plaintiff in the local and national economies, he never expressed that those jobs would have to be part time.

When the evidence is susceptible to more than one reasonable interpretation, as may be the case here, the agency's decision must be upheld. *Batson*, 359 F.3d at 1193. This Court finds that substantial evidence shows that the ALJ concluded that Plaintiff could work full time.

### 2. **Incomplete Hypothetical.**

Plaintiff argues that the ALJ did not include all of Plaintiff's limitations when he posed the hypothetical to the VE and that the ALJ mischaracterized the VE's testimony. Specifically, he argues

1  that the ALJ failed to include the limitations that Plaintiff could "lift and/or carry up to . . . 10 pounds
2  frequently, and to sit, stand, and/or walk up to 6 hours per 8 hour workday" and "is limited to the
3  performance of simple repetitive as well as detailed but noncomplex mental tasks in the competitive
4  workplace (20 C.F.R. 404.1545 and 416.945." AR 19, 23.  Defendant argues that the hypothetical
5  included all limitations, but admits the limitations were not expressly set.

The ALJ's hypothetical included these limitations:

> . . . no continuous repetitive pushing or pulling with the right upper extremity, and no work at shoulder level or above with right upper extremity, and the lifting restriction of 15 pounds. . . . sit-stand option . . . [or] work restriction at the light level . . . [and that] he has depression, and that depression would restrict him from complex tasks and detailed tasks, and reduce him to semi-skilled capacity rather than simple repetitive tasks.

AR 446-449.

"Light" work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. 404.1567(b).  A job may be in this category "when it requires a good deal of walking or standing" or if "it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls." *Id.*  Because the "frequent" lifting or carrying requirement "requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling (SSR) 83-10 *available at* 1983 WL 31251, *6.[8]

The ALJ's hypothetical expressly included a restriction of work at the "light" level. According to the definition in the Code of Federal Regulations, light level work allows lifting or carrying of objects no more than 10 pounds frequently, and standing, walking or sitting for an 8-hour workday. The ALJ's limitations in the hypothetical are consistent with this definition of light work. Further, even if the definition of light work is not considered as part of the hypothetical, that error is harmless because other reliable evidence, namely, the discussion of "light" work outside of the express hypothetical, showed

---

[8] SSRs constitute the SSA's interpretations of the statute it administers and its own regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007). While SSRs do not have the force of law, they are binding on the Commissioner and ALJs. *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996); *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 n.1 (9th Cir. 2001).

that the ALJ considered the restrictions under the definition of light work. *See Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) (ALJ's failure to include all limitations in a hypothetical is harmless where other reliable evidence supports the ALJ's findings).

Plaintiff also argues the hypothetical is incomplete because in the RFC the ALJ found Plaintiff was limited to "detailed but noncomplex mental tasks in the competitive workplace," (AR 23) but in the hypothetical, only said that Plaintiff was limited to "semi-skilled capacity" (AR 448). At the hearing, the VE defined "semi-skilled" work as work involving "more detailed tasks." AR 443. The VE also stated that "as soon as you go beyond simple repetitive tasks, both jobs that I identified [counter clerk and routing aide] would accommodate the [semi-skilled capacity] work restriction." AR 448. In his findings, the ALJ said Plaintiff could perform "simple repetitive as well as detailed but noncomplex mental tasks." AR 23. Based on the VE's definition of semi-skilled work, this Court finds that the ALJ's finding that Plaintiff could do "detailed but noncomplex mental tasks" is synonymous with the VE's finding that Plaintiff could do "semi-skilled" work, that is, work that involves "more detailed tasks."

Finally, the Court recognizes that while the ALJ concluded that Plaintiff is able to perform the job of "information clerk," the VE actually testified that the job of "information clerk" is not available to Plaintiff because of the reasoning level involved. This Court finds that error harmless because the ALJ identified two other jobs–"counter clerk" and "routing aide"–that are available to Plaintiff based on his restrictions.

This Court finds that substantial evidence supports the ALJ's findings regarding all the restrictions that he identified as specific to Plaintiff. It also finds that substantial evidence supports the finding that at least two categories of jobs are available to Plaintiff based on his restrictions.

**3.     Findings Regarding Plaintiff's Mental Limitations.**

Plaintiff argues that no substantial evidence supports the ALJ's findings on Plaintiff's mental limitations because the ALJ's RFC substantially differs from the ME's RFC opinion, and the ALJ failed to discuss the discrepancy. Defendant disagrees.

In general, a treating physician's opinion is entitled to more evidentiary weight than an examining physician's opinion. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Where other

medical evidence contradicts the treating physician's opinion, the record must contain specific and legitimate reasons based on substantial evidence to reject the treating physician's opinion. *Id.* Further, "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

Here, a non-examining state agency psychiatrist, Dr. Amado, found that Plaintiff was moderately limited in only six of twenty mental activities evaluated, and that he was not significantly limited in the remaining fourteen categories. AR 296-297. He concluded that Plaintiff's impairments "would appear to not preclude the ability to sustain unskilled work," and that Plaintiff can "sustain simple repetitive tasks . . . can adapt and relate to coworkers and [supervisors and] can work with [the] public." AR 298.

Dr. Phillips, Plaintiff's treating psychiatrist, found that Plaintiff was alert, and demonstrated normal speech, a coherent thought process, cooperative behavior, normal intellect, depressed mood, normal memory, marginal insight and poor judgment but gave him a GAF score of only 45.[9] AR 345. Dr. Rothberg, the psychiatrist and neurologist who served as the ME, testified that Dr. Phillips' report was internally inconsistent because the GAF score of 45 was inconsistent with his description of Plaintiff's mental status. AR 436. Dr. Rothberg concluded that Plaintiff would probably have only some mild impairment in working with the public, interacting with others, concentration, attention and pace. AR 441-442. He opined that Plaintiff could do the activities of daily living. AR 442. Dr. Rothberg also stated that "I don't think [Plaintiff] should be relegated to simple tasks. He should be able to do more complex tasks. He would not be optimally efficient in doing them. He would have some impairment, but he would not be precluded from doing them." AR 444. In his findings, the ALJ said "I agree with the medical expert, whose conclusions are well supported." AR 19.

First, this Court finds that the ALJ's finding that Plaintiff's limitations may restrict him to "detailed but noncomplex mental tasks" is not substantially different than the ME's opinion that Plaintiff "should not be relegated to simple tasks [and that] he should be able to do more complex tasks." Both

---

[9]Plaintiff also argues that the ALJ should have considered the opinions of several other psychiatrists who provided low GAF scores to Plaintiff. *See* Pl.'s Mem.Ps&As p.16, l.11-p.17, l.1. These psychiatrists, however, did not specify any functional limitations, and the Court cannot look to only GAF scores to assess a claimant's functional limitations. *See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01 (Aug. 21, 2000).

agree that Plaintiff can do more than simple tasks.  The ME's statement that Plaintiff could do "more complex" tasks did not necessarily mean Plaintiff could do complex tasks, but could–as the ALJ found–do tasks that were more complex than just simple ones.

Second, to the extent there is any discrepancy between the ME's opinion and the ALJ's findings, substantial evidence in the record supports the ALJ's findings.  Dr. Amado opined that Plaintiff could sustain unskilled work and simple repetitive tasks, and that he could adapt and relate to coworkers, supervisors and working with the public. Except for the statement on simple repetitive tasks, his opinion is consistent with that of Dr. Rothberg, who found that Plaintiff would probably have only some mild impairment in working with the public, interacting with others, and with concentration, attention and pace. Dr. Rothberg rejected Dr. Phillips' evaluation, namely, because his written evaluation was inconsistent with the low GAF score he gave to Plaintiff.

In drafting his findings, the ALJ relied on the same evidence that Dr. Rothberg did when he concluded that Plaintiff's mental impairments did not prevent him from performing simple repetitive or detailed but noncomplex tasks.  This Court finds that substantial evidence in the record, namely, Dr. Amado's opinion and Dr. Rothberg's reasons for rejecting Dr. Phillips' opinion, support the ALJ's findings.

### 4. **Discrepancy Between the VE's Testimony and the DOT.**

Plaintiff argues that the VE cited incorrect numbers from the *Dictionary of Occupational Titles* (DOT) regarding the job of information clerk, and that the ALJ failed to resolve the conflict between the DOT and the VE's testimony.  Defendant acknowledged the discrepancy between the DOT numbers for the information clerk position, but said the error was harmless because the VE identified two other jobs Plaintiff could perform.

SSR 00-4p requires an ALJ to ask a testifying vocational expert whether the expert's testimony is consistent with the occupational information provided in the DOT.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  The ALJ must "obtain a reasonable explanation for any apparent conflict." *Id.* at 1153.  A court cannot determine whether an ALJ properly relies on a vocational expert's testimony and whether substantial evidence supports the ALJ's finding where the record does not contain information that either confirms there is no conflict or reasonably explains the conflict. *Id.* at

1153-54. The failure to ask, however, may be a harmless procedural error where there is no actual conflict or if the vocational expert provided sufficient support for his or her conclusion so as to justify any potential conflicts. *Id.* at 1154 n.19. Further, to satisfy Step 5 of the process to determine eligibility for disability benefits, the vocational expert need only identify "a specific job." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).

This Court finds that the ALJ's failure to ask the VE whether her testimony was consistent with information found in the DOT is harmless because the VE identified two other jobs that Plaintiff could perform with his limitations. The fact that the VE provided the wrong number for one job does not take away from the fact that the VE identified jobs that exist in the local and national economies that Plaintiff can perform.

### 5. Rejection of Lay Witness Testimony.

Plaintiff argues that the ALJ's rejection of Ms. Lewis' testimony constitutes legal error. He says he offered the testimony to show how his impairments affected his ability to work and that the ALJ needed to give reasons for rejecting this testimony. Defendant argues that the ALJ properly considered the lay witness testimony and rejected it because it was not supported by objective evidence in the record.

An ALJ may consider testimony from non-medical sources regarding how an impairment affects a claimant's ability to work. 20 C.F.R. 404.1513. Such sources may include a spouse. 20 C.F.R. 404.1513(d)(4). Where an ALJ fails "to properly discuss competent lay testimony favorable to the claimant," the error is harmless if the reviewing court "can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, the ALJ stated that he "considered the anecdotal statements of record from the claimant and his wife." AR 22. He found that "considering the medical evidence of record as a whole and the longitudinal objective clinical and laboratory documentation, I cannot accord controlling weight to those statements, which are not from disinterested parties, and are not supported by the objective evidence of the record." AR 22. Plaintiff correctly argues that the fact that Ms. Lewis is not a disinterested party is not grounds to reject her testimony. The remaining issue is whether any objective evidence in the record

supports her testimony.

This Court has not found any objective evidence in the record to support Ms. Lewis' testimony. For example, no physician opined that Plaintiff was as physically limited as Ms. Lewis said that he was, such that Plaintiff could not stand up for very long or that he could only walk five to ten minutes before needing to rest. *See, e.g.*, Evaluations of Drs. Liebham (AR 169), Maywood (AR 225), Abitbol (AR 215) and Lizarraras (AR 271). Considering the weight of the documented medical evidence, the ALJ properly refused to give controlling weight to Ms. Lewis' observations.

Further, most of what Ms. Lewis addressed was not germane to Plaintiff's impairments or limitations. For example, she made comments like, "He helps me on bad days when I want to give up and I try to be there for him." AR 106. When asked about changes in social activities, she said "he can't do anything and when it builds up inside he feels like he's less than a man. He tries to do things for me which ends up making it worse for him." AR 110. These observations do not address Plaintiff's functional limitations, and the ALJ properly rejected them.

This Court finds that the ALJ considered Ms. Lewis' testimony and that substantial evidence supports his decision to not give it controlling weight. To the extent the ALJ failed to properly discuss her testimony, such error is harmless because even giving her testimony full credit, the Court does not believe a contrary finding regarding disability could be reached.

## CONCLUSION

Based on the preceding discussion, this Court concludes that the ALJ's denial of benefits is supported by substantial evidence. Therefore, the Court **RECOMMENDS** that Plaintiff's motion for reversal and/or remand be **DENIED** and that Defendant's cross motion for summary judgment be **GRANTED.**

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

This Report and Recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before ***February 8, 2008.*** The document should be captioned "Objections to Report and Recommendation." Any response to the objections shall be filed and served on or before ***February 15, 2008***. Failure to file objections within the specified time may affect the scope of review on appeal. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: January 29, 2008

Hon. Nita L. Stormes
U.S. Magistrate Judge